UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 97-0735-CR-ZLOCH
375

UNITED STATES OF AMERICA,
    Plaintiff
Vs.

PETER JOZEF HARGITAY,
    Defendant



## NOTICE OF FILING AFFIDAVIT OF PETER JOZEF HARGITAY

   PLEASE TAKE NOTICE that the Defendant PETER JOZEF HARGITAY, by and through the undersigned attorney, now files the attached Affidavit of Peter Jozef Hargitay.

## CERTIFICATE OF SERVICE

   I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished by U.S. Mail to Yvette Prescott, Esquire, Assistant United States Attorney, 99 NE 4th Street, Suite 800, Miami, Florida 33132-2111 this 16th day of June, 1997.

David P. Rowe, Esq.
18800 NW 2nd Ave., Suite 105 A-C
Miami, FL 33169
Tel. 305-653-6900
FL. Bar No. 373575

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
**CASE NO. 97-0735- CR. ZLOCH.**

UNITED STATES OF AMERICA
    Plaintiff
vs.
PETER JOZEF HARGITAY
    Defendant.

**AFFIDAVIT OF PETER JOZEF HARGITAY.**

STATE OF FLORIDA
COUNTY OF DADE

    BEFORE ME the undersigned authority personally appeared PETER JOZEF HARGITAY, who having been first counseled and duly sworn by me states:

1. I was born in Hungary on August 28, 1951 and lived in Switzerland from age 5. I am a Swiss citizen. I am the defendant in the above styled cause.

2. On April 2, 1997 I was detained at the Miami International Airport and refused entry to the United States, despite my having presented a letter from a Jamaican Court that I had been acquitted as Not Guilty in a narcotics trial in 1996. 29 hours later, on April 3, at approximately 5.00 P. M. I was arrested on Extradition proceedings at the Request of the Office of International Affairs, State Department, Washington, D.C. and based on an alleged international warrant dated August 1995 by Interpol Budapest; the warrant in question was not a judicial warrant as requested by US law. I waived Extradition proceedings but I was not released to the Hungarian authorities for over six weeks, a fact which does not reflect of the Treaty between Hungary and the United States, in particular Article 18 of the said Treaty. I petitioned for Habeas Corpus and my petition has been denied as moot.

3. After having been incarcerated for some 7 weeks at the FDC in Miami, pending my extradition to Hungary, I have been arrested and indicted on a Grand Jury Indictment on two counts of conspiracy , to wit, to import cocaine into the United States and to possess with intent to distribute

i

cocaine in the United States in violation of the United States statutes cited in the Indictment.

4. I was the Chairman of CEA LINES, a subsidiary of a publicly owned corporation which owned and operated the cargo ship M/V PILAR DEL CARIBE. I did not own any shares in this corporation either directly or indirectly at any time.

5. As the company's Chairman, it was my responsibility to develop the company, grow it and expand it, and seek adequate financing. One of my achievements was to merge the majority of the shares of CEA Lines, Inc. into a publicly traded company.

6. As Chairman of the company, I had no operational responsibilities for the vessel. From the very beginning of my position as Chairman. CEA Lines started to trade in January of 1995. I delegated the operational side of the business to experts: first to a general agent, Fillette-Greene, Inc., of New Orleans, then in the spring of 1995 to OSA, Inc. (OSA) of Houston, Texas. The general agents, OSA, also acted as cargo brokers. It was OSA who determined WHEN the vessel was going WHERE.

7. OSA negotiated all cargo contracts, made all negotiations for cargo and identified all cargo for the vessel at all times.

8. I had no influence over the cargo which I did not organize ever. I never signed any cargo agreements. My job was to make sure that the general agents/cargo brokers got paid. They in return paid crew wages, fuel, lube, supplies and billed it to CEA Lines. As Chairman of the company, I had the power to Veto a cargo if in my judgment it was not financially beneficial. I never once had the necessity to exercise this Veto power as the brokers were exceedingly efficient to the company.

9. CEA Lines, Inc., a one-vessel start-up company in 1995, generated nearly US$600,000.00 in income during the first six months of its trading history, (January - June 1995). Audited Balance Sheet exhibited hereto as Exhibit "A".

10. In or about March of 1995 I received information that the crew of the Ship had been approached severally by drug dealers in Guyana, Jamaica and Venezuela, points which the ship had visited on several occasions with southbound cargo. I brought this information to the general counsel of the Ship, Charles Rose, Esq., of New York, former Executive Assistant United States Attorney in New York for some 17 years, and regularly Special United States Attorney and sought his advice.

11. I am informed by Charles Rose, Esq., and I verily believe that in about March 1995, Charles Rose, Esq., contacted Mr. Frank Tarallo, SA in charge of the Miami Field Office of the DEA and advised him of my report. Mr. Tarallo, a personal friend of Mr. Rose for nearly two decades and former associate of his in law enforcement in New York, contacted the DEA Country Attaché in Kingston, Jamaica, and suggested that contact be made with me.

12. At that time I was away from Jamaica on business in Europe and when I returned to Jamaica I received a message to call "Steve, Frank's friend from Miami" and I called the telephone number provided.

13. I called "Steve" who was the CO, Steven Wiedener, and we met once. Later I was invited to the DEA Office where I was introduced to Mr. W. D. Crawford, DEA Field Agent in Jamaica and we discussed the reports of approaches which had been made by drug dealers to members of the crew of the ship M/V PILAR DEL CARIBE. In particular I related two reports to the DEA, both of which I had received from the Ship's Chief Engineer, Herman Ahmad. They contained information about direct contacts having been made, one in Jamaica, and one in Puerto Cabello, Venezuela. Both times the dealers had approached a Jamaican crew member, Alexander Wilmott, an oiler in the engine room.

Jamaican drug dealers had offered Wilmott to take some 400 pounds of ganja (marijuana) and a quantity of hash oil on board, while a Jamaican living in Venezuela had offered Wilmott to take a test-run of 18 kg. of cocaine onto the vessel. After Wilmott informed his supervisor, the Chief Engineer, the latter advised me and I instructed him to keep his eyes open but refrain from any such offer.

During the above captioned meeting at the DEA's Kingston Office, I related both incidents to Mr. Widener and Mr. Crawford. It was agreed that I would keep in touch with Mr. Crawford if further reports of contacts from these sources were received. It was further agreed that the DEA was interested to get involved in so-called "controlled deliveries". As the Ship was a "tramper" and not a "liner", no dates would be discussed, since I was unaware whether or not any northbound cargo would be available at all or any time soon. Mr. Crawford suggested nevertheless, to place a DEA employee aboard the vessel.

3

13. Sometime after said meeting, while the vessel was on crew-change in Kingston and headed for Turks and Caicos Islands with Jamaican cargo, I received a phone-call from the Chief Engineer. He said that Wilmott had been approached again and that the drug dealers were ready to deliver the marijuana.

I immediately called Mr. W. D. Crawford, who requested some time and called me back. He said that the DEA were <u>not interested in marijuana</u> for a controlled delivery and that I should instruct the Chief Engineer to sever all contacts with the drug dealers.

I did as I was told. To my complete surprise, Ahmad called me the next day, early in the morning, and was most disconcerted when he told me that against his clear orders, Wilmott had assisted the drug dealers during the night to load the drugs.

I immediately called Mr. Crawford who was most upset and promised to call back with instructions. A short while later he rang me and instructed that the drugs be thrown overboard and that he would advise the Jamaican Narcotics Police that the crew had " found the bags floating in the water". He also said that the crew were to say the same.

Upon the arrival of the Narcotics Police, the bags were heaved on board and the Chief Engineer gave a statement as requested by Mr. Crawford.

Two days later, Sergeant Dell of the JND, visited me in my office and wished to receive additional information. I told her the events as Mr. Crawford had advised me to do but I also blamed Alexander Wilmott and informed the Sergeant that the Company would fire him as he was no longer trustworthy.

Based on the information received from me, the Narcotics Police later issued a Warrant for Wilmott's arrest. Wilmott was fired the very day I was made aware of the happening. To the best of my knowledge he subsequently fled the Island.

14. At or about 5-6 weeks later, on June 19, 1995, I attended a meeting at the DEA office in Miami with Mr. Frank Tarallo, Mr. Mike Shamos and

4

Mr. W. D. Crawford. This meeting was arranged by Charles Rose, Esq., of counsel to CEA, Inc. At this meeting after I had told the DEA that the Chief Engineer had reported several contacts and that dealers in Venezuela had suggested large quantities, first to the since fired Alexander Wilmott, later to his supervisor Ahmad and that they wanted a test run first, it was agreed:

(a) The DEA were very interested in our cooperation and grateful for our initiative to have contacted them;

(b) The DEA would provide an undercover agent on the Ship as had already been suggested by Mr. Crawford at the earlier meeting in Jamaica, whose identity would be known only to the Captain and myself.

(c) The DEA would pay the company's extra expenses if a detour became necessary, including fuel. lube oils, port fees, etc.)

(d) The Company would get a financial contribution of any cash funds which were paid as a result of our cooperation with the DEA;

(e) That "Controlled deliveries" would be made whereby the drugs would not be seized in the port but would be followed by the DEA so as to protect the vessel;

(f) That if contact was made, the undercover agent or Mr. Crawford or Mr. Tarallo and Mr. Shamos would be informed.

15. At the time of my meeting with the DEA, the vessel was in Venezuela and drug dealers had repeated their offer to the parting Chief Engineer, Ahmad, to take on 18 kg. of cocaine as a test run. (The Company had fired Ahmad, whose last leg of employment was between Turks and Caicos and Puerto Bello).

Ahmad called OSA in Houston and asked them to contact me urgently. OSA finally found me in London where I was on business. I called the Ship's local Venezuelan port-agents and Ahmad told me about the proposal. The Chief Engineer of the Ship was Herman Ahmad. I immediately called Mr. W. D. Crawford in Jamaica, who, via EPIC, in New Mexico, advised the DEA in Venezuela who in turn instructed Ahmad and instructed him "to leave the offer alone" as it was an irrelevant quantity.

16. Against my clear orders that he should have nothing to do with the cocaine having regard to the instructions from the DEA, Ahmad permitted the cocaine to be taken aboard the ship and secreted it in such a way that I nor any crew member was aware of its presence there. Ahmad left the ship the day after the instructions were received from the DEA to "leave the offer alone" for California where his father had just died. Nobody knew about

the drugs on board until nearly two months later. Ahmad later stated that he had not managed to contact me as I was "always traveling".

17.     At the end of July, 1995, after the ship had taken the undercover agent, Ian Haughton, aboard, and delivered cargo to the Dominican Republic from Jamaica, she developed severe mechanical trouble and was threatening to sink on huge seas eastbound.

The Agents, OSA, called me and advised that the nearest port had to be found in an emergency. The vessel arrived in Kingston in the night of August 1 and was immediately docked, her affed lifted out of the water, the repairs initiated.

At this time it became necessary to employ the services of the former Chief Engineer Ahmed, who by this time was back in Canada, where the agents reached him. Ahmad flew down to Jamaica in the first days of August to join the repair team.

During this time I was traveling in the United States where CEA Lines" mother company had its offices.

On August 8, in the evening, Ahmad called me at my office and said, "I have good news and bad. The good news is that the emergency repairs are nearly complete, the bad, that there is cocaine on board".

I was completely taken aback by this information and extremely upset.

The next morning, I was scheduled to fly to New York where I met with Mr. Charles Rose and where I was to meet with my young son who was flying in from Europe to spend his summer holidays with me.

I warned Ahmed off not to touch anything and to make sure the drugs where they had been stashed away until my return from the United States. In New York I immediately informed Mr. Rose about the information I had received and it was decided to seek the advice of the DEA upon my return.

I cut my son's holiday short and returned to Jamaica with him.

6

Upon my arrival in Kingston on August 14, I called a meeting at which Ahmad told the Captain, the DEA agent aboard and myself the details of how the drugs had been brought on board full two months before in Venezuela. The Minutes of this meeting are exhibited hereto as Exhibit "B"

18. At no time after the cocaine was secreted aboard the ship by Ahmad was the Ship destined to the United States. It voyaged to Santo Domingo, and was enroute to Mexican waters when it developed a severe water leak and had to seek emergency repairs in Kingston, Jamaica.

19. Despite the fact that I personally went to see the Chief of the Jamaican Narcotics Police, R. Grant, on August 16, 1995 and gave a voluntary statement as to the circumstances of the drug-find, and despite the fact that I had fully honored the Agreement made with the DEA in Miami two months earlier, and to my complete shock I was charged in the Jamaican Court with offenses similar to those contained in the present Indictment and after a long and extremely thorough trial I was acquitted. Superintendent Reginald Grant, Chief of the Narcotics Police of Jamaica testified in cross-examination, on oath during that trial, that the crew and I reported the find of the cocaine on the Ship to the Police.

20. The night of the actual drug-find and Ahmed's report to the Captain, myself and Haughton, it was the undercover agent's turn for night watch. A fortuitous coincidence, I thought, as I was certain that no one would tamper with the drugs.

From the meeting, on my orders, Haughton called Mr. Crawford on the Ship's mobile phone, and I called Mr. Rose, now that I knew the details.

To all our surprise when the Jamaican Police came the following day, they only found 16 kg. of cocaine. Ahmad swore and always had spoken of 18 kg. No one else was seen near the drugs during that night nor the next day. The only two people who knew where the drugs were hidden were not aboard the vessel the next day. Haughton had disappeared that same night and Ahmed had left on the 14th after the meeting as he was planning to go back to Canada the next day

21. The DEA undercover agent, Ian Haughton, testified at that trial and the learned Judge found him to be a liar and unworthy of belief.

7

22. Following the treatment which I received from the DEA's agent Crawford and informant Haughton, and my arrest, trial and acquittal in Kingston, I have written articles critical of the methods of the DEA's Jamaican Agent, Crawford, which articles were published in Jamaican and European newspapers.

23. Since my trial and acquittal in Jamaica and the publication of my articles in the newspapers, Mr. W. D. Crawford has been transferred from Jamaica to the Miami Office of the DEA. The head of the Narcotics Police, Superintendent Reginald Grant, was relieved of his duties a few months after my acquittal. Large amounts of drugs had disappeared from a storage area under his personal control and the entire warehouse where seized drugs were stored had burned down mysteriously.

24. I have spent the period between August 1996 and December 1996 on an extended trip through Europe with my wife and my little daughter, visiting my parents and family. I crossed at least 10 borders and was in many countries. Nonetheless, I was neither arrested nor stopped anywhere in Europe despite the alleged Interpol Warrant apparently outstanding for my arrest. When I returned to Jamaica towards the end of 1996, a former crew member of the M/V PILAR DEL CARIBE, brought me the shocking news that Alexander Wilmott, the very man who had "been contacted" by drug dealers in Jamaica and Venezuela, the very crew member whom I had personally fired in 1995 and who had been the first one to mention the cocaine test-run to the then Chief Engineer, had been found dead in the USA, shot by bullets in his head

8

24. I have been informed by many persons that Mr. W. D. Crawford DEA agent, has made statements of and concerning me indicating that he is prepared to retaliate against me and I believe that this Indictment following my acquittal in Kingston, Jamaica and the facts outlined herein, indicate that the present Indictment is unwarranted in law.

PETER JOZEF HARGITAY.

SWORN TO BEFORE ME THIS 10th DAY OF JUNE, 1997.

NOTARY PUBLIC
My Commission Expires:

PERCIVAL R. TODD
COMMISSION # CC 425162
EXPIRES JAN 15, 1999

David P. Rowe, Esq.,
18800 NW 2nd Ave, # 105 A-C.,
Miami, FL 33169
Tel. 305-653-6900
FBN 373575

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished by US Mail to Yvette Prescott, Esq., Assistant United States Attorney, 99 NE 4th Street, Miami, FL 33132-2111 this 10th day of June, 1997. 1997.

David P. Rowe, Esq.